**UNITED STATES of America, Appellant,**

v.

**Wayne HUNTSMAN and Ralph Huntsman, Appellees.**

No. 91–2549.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 9, 1991.

Decided March 26, 1992.

Sandra W. Cherry, Little Rock, Ark., argued, for appellant.

Samuel A. Perroni, Little Rock, Ark., argued (Roxanne T. Wilson, on the brief), for appellees.

Before LAY,* Chief Judge, WOLLMAN and HANSEN, Circuit Judges.

WOLLMAN, Circuit Judge.

The district court dismissed with prejudice the indictment against Wayne Huntsman and Ralph Huntsman and granted their motion for judgment of acquittal notwithstanding the jury's verdict. The government appeals. We reverse and remand.

## I.

This case involves the agricultural commodities price support and adjustment program administered by the Commodity Credit Corporation (CCC) through the Agricultural Stabilization and Conservation Service (ASCS). Under the program, if the average market price for wheat, feed grain, certain types of cotton, or rice falls below the target price set by Congress, the government makes up the difference by paying money—"deficiency payments"—to participating farmers. Agricultural Act of 1949, ch. 792, Title IV, §§ 401 et seq. (codified as amended principally at 7 U.S.C.A. §§ 1421 et seq. (West 1988 & Supp.1991)).

Participants in the program could also borrow money from the government, using their crops for collateral ("commodity loan"). If the farmer decides not to repay the loan, he may simply keep the money and let the government keep the collateral.

Applicable regulations provide that, to be eligible for payments under the program,

one must be a "producer" on a farm that is in compliance with certain reporting and other requirements. 7 C.F.R. § 713.50 (1984 and 1985) (redesignated at 7 C.F.R. § 1413). To be a "producer," one must be "a person who shares in the risk of producing the ... crop in the current year (or shares in the proceeds therefrom) ... or would have shared in the crop if it had been produced...." 7 C.F.R. § 713.50(c).

For the years 1982–85, each "person" could receive no more than $50,000 in annual deficiency payments. Agricultural Act of 1981, Pub.L. No. 97–98, 95 Stat. 1213, 1263 (codified as amended at 7 U.S.C.A. § 1308 (West 1988 & Supp.1991)). Regulations provide that an individual or legal entity is a "person" entitled to receive deficiency payments only if he: 1) has a separate and distinct interest in the crop or the land on which the crop is produced; 2) exercises separate responsibility for that interest; and 3) is responsible for paying the cost of farming related to that interest from a fund or account separate from that of any other individual or entity. 7 C.F.R. § 795.3 (1984 and 1985).

Thus, a landlord and a tenant could each be eligible to receive up to $50,000 in deficiency payments. To qualify, each would have to fulfill two requirements. First, each would have to be a producer in order to participate in the program at all. Second, each would have to be a separate person. To take part in the program, both the landlord and the tenant would sign a "Contract to Participate in Price Support and Production Adjustment Programs" ("Contract") with the ASCS. The landlord would sign the Contract as the "operator," defined in the Contract's appendix as "the person who is in general control of the entire farming operation on the farm" during the relevant year. The tenant would sign the Contract as a "producer," defined in the Contract's appendix as "a person who, as owner, landlord, tenant, or sharecropper shares, or would have shared had the crop been produced, in the risk of pro-

* The Honorable Donald P. Lay was Chief Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status on January 7, 1992, before the opinion was filed.

ducing the crop (or shares in the proceeds therefrom)...."

During 1984 and 1985, several tenants entered written lease agreements with Huntsman Farms, Inc. ("Huntsman Farms") to rent rice or wheat land. Each tenant also signed a Contract with the ASCS to participate in the price support program, representing themselves as producers, with their landlord, Huntsman Farms, as the operator. The government brought a seven count indictment against Wayne and Ralph Huntsman, charging that they had caused the tenants to misrepresent their status to the ASCS in order to qualify for the program. Count I of the indictment charged that, between 1984 and 1987, Wayne and Ralph Huntsman conspired with each other and with other persons to cause the tenants to falsely represent that the tenants were "producers," when in fact Huntsman Farms was the true producer. Count I further charged that, as part of the conspiracy, Wayne and Ralph Huntsman used the tenants to circumvent the "separate person" requirement, and that Wayne and Ralph Huntsman diverted the program payments from the tenants to themselves and to Huntsman Farms in circumvention of applicable regulations.

Counts II through VII each charged that Wayne and/or Ralph Huntsman caused a particular tenant to misrepresent his status as a "producer" in 1984 and/or 1985, when in fact Wayne and Ralph Huntsman knew that Huntsman Farms would be the true producer.[1] Counts II through VII did not incorporate by reference the allegations contained in Count I. Each of Counts II through VII did, however, specify that each tenant made the misrepresentation when he identified himself as a "producer" on

the Contract he entered into with the ASCS.

At the court's direction, the government later amended the indictment by filing a bill of particulars. The bill of particulars described the program's requirement that each "person" receive no more than $50,-000.00 under the program and recited that the false statements alleged in the indictment were made to circumvent the definition of the term "person."

The government's proof of the misrepresentations varied for each tenant. Essentially, the government sought to prove that even though each tenant signed a lease with Huntsman Farms that was valid on its face, each lease arrangement was in reality a sham. The government sought to show that each tenant signed up at the behest of Wayne and/or Ralph Huntsman, that each ·simply funneled to Wayne or Ralph Huntsman or to Huntsman Farms the money he received under the program, and that Wayne and/or Ralph Huntsman so manipulated the transactions with the tenants that the four tenants were not in actuality entitled to share in the proceeds from the crops produced on the leased land.

The first of the four tenants, Bill Long, had leased land from Huntsman Farms on which to grow soybeans prior to 1984. Those leases had been on a crop share basis, i.e., Long paid a portion of the crop as rent. Long stated that he controlled the planting, harvesting and sale of the beans grown on land subject to his lease.

Long signed a Contract with the ASCS to participate in the price support program for the years 1984 and 1985. He represented to the ASCS that he would lease 500 acres of rice land from Huntsman Farms during 1984 and 350 acres in 1985, for $150 per acre. Long testified that he did not intend to grow rice either year, and in fact did not,

---

**1.** Specifically, the government charged as follows: Count II charged that Wayne Huntsman caused Bill Long to misrepresent his status on or about March 15, 1984; Count III charged that both Wayne and Ralph Huntsman caused Roy Crowder to misrepresent his status on or about March 15, 1984; Count IV charged that Wayne and Ralph Huntsman caused Roy Crowder to misrepresent his status on or about June 12, 1985; Count V charged that Wayne Huntsman

caused Bill Long to misrepresent his status on or about June 14, 1985; Count VI charged that Wayne caused Jimmie Mason to misrepresent his status on or about June 12, 1985; and Count VII charged that Ralph Huntsman caused L.E. Jack Parks to misrepresent his status on or about June 20, 1985. Each of the named dates corresponds to the date the respective tenants signed a Contract to Participate with the ASCS.

although he knew that someone grew rice on the land subject to his lease during 1984 and 1985. Long testified that he signed up for the rice program because "Wayne asked me if I would participate in the program ... [b]ecause of the government limitations they had on the payment."

Long stated that he received none of the proceeds from the sale of the rice crop produced on the land to which his lease applied, and incurred none of the expenses. Long testified that he did, however, receive a $27,996.91 check for deficiency payments under the program in 1984. Long stated that he gave the check to Wayne Huntsman according to an agreement between the two. Long was entitled to receive an additional $22,003.09 in deficiency payments in 1984, but that money was withheld to pay money that he owed to the government. In 1985, Long received several checks under the program. One of the checks he kept as a loan from Wayne Huntsman, but he directed that the remainder of the checks be deposited in his wife's account and their proceeds paid to Wayne Huntsman.

The second tenant, Roy Crowder, had worked for Ralph Huntsman as an employee and had sharecropped rice and bean land under oral agreements with members of the Huntsman family prior to 1984. The only leases which were written, he stated, were those he entered in conjunction with the price support program. When Crowder had grown beans on land leased from the Huntsmans, Crowder handled the transport and sale himself.

Crowder signed leases with Huntsman Farms for 500 acres in 1984 and 350 acres in 1985, at $150 per acre. Crowder testified that he thought that price to be very high, and that one could not make any money farming rice on such terms. In his opinion, $75 per acre would be a fair price. Crowder did not control the storage and sale of the rice grown on the land subject to the written lease with Huntsman Farms. As far as Crowder knew, Wayne Huntsman made the decisions regarding sale of the rice.

Crowder testified that he signed up for the program at Wayne's behest. He did not realize that he would qualify for money from the government; he thought that his signing up was necessary to prevent the government from reducing the Huntsman's allotment of land for rice farming.

The record reveals several instances where Crowder received money from the program, then either gave it to one of the Huntsmans directly or deposited it in his own account before writing checks to the Huntsmans. In 1984, for example, Wayne Huntsman told Crowder that they needed to go to the ASCS office to pick up a check. After the pair retrieved the check (a commodity loan check for more than $112,000.00), Wayne Huntsman offered to deposit it for Crowder. The check was never deposited in Crowder's account. In 1985, Crowder received a $50,000.00 rice deficiency check from the program and deposited it in his account. The day after Crowder deposited the check, one check for $23,500.00 and one for $22,500.00 were drawn on the account, payable to Huntsman Farms, for rent and combining expenses. Crowder testified that Ralph Huntsman made out the checks and Crowder directed his wife to sign them. Crowder stated that combining expenses for the 350 acres of rice land he rented from Huntsman Farms should have been no more than $10,000.00 to $15,000.00. Crowder also maintained that his usual wages were withheld after he received the $50,000.00 rice deficiency check. In effect he kept in lieu of wages the $4,000.00 difference between the $50,000.00 deficiency payment and the $46,000.00 paid to Huntsman Farms.

The third tenant, Jimmie Mason, had rented soybean land from the Huntsmans under an oral crop share agreement prior to 1984. Mason had never farmed rice, but when Wayne Huntsman asked if Mason would lease rice land from the Huntsmans and participate in the program, Mason agreed. Mason signed a lease agreement with Huntsman Farms to rent 350 acres of rice land at $150 per acre. Mason later changed his mind and told Wayne Huntsman that he would not farm rice, and therefore would not participate in the program.

Nonetheless he signed the Contract with the ASCS to participate in the program, with the understanding that Wayne Huntsman would use Mason's name to keep the 350 acres of rice land in the program. Although Mason helped harvest rice in 1985, as he had previously, he was paid for this service. He stated that he did not own the rice produced on the land to which his lease agreement applied.

Mason received a check from the program in early 1985 and deposited it in his own account. The next day he signed a check drawn on the account; Wayne Huntsman filled in the check for the same amount that Mason had deposited the day before, noting on the check's memo line that the check was for "rice rent." Mason stated that he did not consider the government checks to be his since he had decided not to participate in the program. Mason also received a commodity loan payment of $62,090.80 from the program in 1985. The day after he deposited that sum in his account, two checks were drawn on Mason's account: one for $43,650.00 to Huntsman Farms for "rent," and another for $18,440.80 to Huntsman Granary for "storage and drying." Wayne Huntsman filled out the checks; Mason simply signed them.

The fourth tenant, Jack Parks, was a school principal acquainted with Ralph Huntsman. He had never farmed. He stated that late in 1984, Ralph Huntsman suggested that Parks rent wheat land from Huntsman Farms and that Ralph would manage the farming for him. Parks signed a lease agreement with Huntsman Farms to rent 1780 acres of wheat land on a crop share basis. He may also have been involved in farming soybeans, but could not recall. Ralph Huntsman loaned Parks $8,000.00 to start the venture and instructed Parks to open a separate farm account with the loan. Parks stated that he did not control what was grown on the land, nor when any crops would be sold.

In 1985, Parks signed a Contract to participate in the program. He stated that he did not know what the program was, but he recalled Ralph Huntsman telling him that it was necessary in order to continue farming. In any event, he signed up because Ralph Huntsman asked him to do so.

Early in 1985, Parks received a check from the program for $25,047.09, which he deposited in his farm account. Two months later, he wrote a $24,000.00 check to Huntsman Farms. Parks recalled that Ralph Huntsman instructed him to write the check to cover the rent on the land. The record does not explain why cash rent was due under Parks' crop share lease with Huntsman Farms; it may have been due under any soybean venture in which Parks was involved.

Parks received other checks from the program during 1985 and deposited them in his farm account. He then wrote checks at Ralph Huntsman's direction. Parks recalled the purpose of some of these checks, such as the repayment of the $8,000.00 loan Ralph Huntsman had extended him. Parks did not recall the purpose of other checks that he wrote, for example an $11,500.00 check for seed beans payable to an acquaintance of Ralph Huntsman, or an $8,930.00 check payable to Ralph Huntsman, of which $6,930.00 was designated as "interest payment" and $2,000.00 as "principal."

At Ralph Huntsman's direction, Parks wrote two checks in late 1985 to his son and daughter. Each was for $3000.00, and each was designated for "farm labor '85." Parks' son had worked for Ralph Huntsman as a farm laborer and had been paid for that work, but Parks' daughter had never worked on the farm. Both the son and the daughter subsequently wrote checks for $3,000.00 to Ralph Huntsman, although they did not recall owing Ralph any money.

To the best of his recollection, Parks neither gained nor lost any money through his wheat farming venture with Ralph Huntsman. There was evidence, however, that Parks' tax return showed a purchase of nearly $60,000.00 in farm equipment from Ralph Huntsman, with a depreciation deduction of approximately $13,000.00 in 1985. Parks stated that Ralph Huntsman had not tried to collect from him any money due on the purchase of farm equipment.

As of January 1990, Parks did not know where the equipment was located.

In closing arguments, the government contended that the four tenants did not exercise separate responsibility for the land they leased. First, they did not control the farming operation on the leased land. Second, each lease arrangement was simply a false front. In fact, the government argued, none of the four tenants shared or were intended to share in the proceeds from the crops.

The jury instructions concerning Counts II through VII identified the relevant false statements as the tenants' representations of themselves as producers. The instructions contained no definition of producers; apparently, none was requested.

The jury acquitted both Wayne and Ralph Huntsman on Count I, the conspiracy charge, but convicted them on Counts II through VII. The defendants moved to dismiss the charges on the ground that there was a fatal variance between the acts charged in Counts II through VII and the proof at trial. The defendants also moved for judgment of acquittal notwithstanding the verdict, on the ground that the evidence was insufficient to sustain the verdict. The district court granted the motions, and the government appeals.[2]

## II.

■ It is reversible error per se to amend an indictment after a grand jury has passed upon it. *United States v. Begnaud,* 783 F.2d 144, 147 & n. 4 (8th Cir. 1986). An amendment occurs "when the essential elements of the offense set forth in the indictment are altered, either actually or in effect, by the prosecutor or the court after the grand jury has passed upon

them." *Id.* at 147 n. 4. Similarly, the acts proved at trial may not vary from those charged in the indictment. *Id.* A variance "occurs when the essential elements of the offense set forth in the indictment are left unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Id.* Reversal is not required if the variance is harmless, that is, if "the indictment fully and fairly apprised the defendant of the charges he or she must meet at trial." *Id.* at 148.

■ The district court reasoned that while the indictment charged that the tenants had misrepresented their status as producers, the proof at trial focused on whether the four tenants qualified as separate persons. Since Counts II through VII did not allege anything regarding whether the misrepresentations involved the tenants' status as separate persons, the district court concluded that the government either constructively amended the indictment or that there was a fatal variance between the indictment and the proof presented at trial.[3]

Our review of the record leads us to a different conclusion. The indictment specified which tenants made alleged false statements, the date the statements were made, and to whom they were made. It detailed who caused each false statement to be made: Wayne Huntsman, Ralph Huntsman, or both. It specified that the statements were false because they represented that the tenants would be producers, when in fact Huntsman Farms was the true producer. The bill of particulars refined the indictment still further, explaining that Wayne and Ralph Huntsman caused the false statements to be made in

---

**2.** Wayne and Ralph Huntsman dispute the right of the government to appeal from the dismissal of an indictment because of an amendment or fatal variance. We reject this argument. *See United States v. Martin Linen Supply Co.,* 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). We also reject their argument that the government has failed to prosecute the appeal in a timely manner.

**3.** The district court's opinion does not make clear whether it found a constructive amend-

ment, a fatal variance, or both. In its opinion, the district court stated its conclusion that "the government is attempting constructively to amend the indictment by altering an element of the offense." *United States v. Wayne Huntsman & Ralph Huntsman,* No. LR–CR–88–151(1) and (2), slip op. at 12 (E.D.Ark. June 10, 1991). The district court went on, however, to address whether the "variance" was "harmless." *Id.* at 13.

order to circumvent the $50,000 per person limitation on payments under the program.

Reasonably construed, therefore, the indictment and bill of particulars indicated that the government would try to prove that Wayne and Ralph Huntsman caused the tenants to apply for the program in order to circumvent the per person payment limitation of $50,000.00. Further, the indictment indicated that the government would try to prove that Wayne and/or Ralph Huntsman pursued this scheme by causing Long, Crowder, Mason and Parks to misrepresent their status when each signed the ASCS Contract to Participate. According to the indictment, the false statements concerned the four tenants' status as producers, defined in the Contract as "a person who, as ... tenant, shares, or would have shared had the crop been produced, in the risk of producing the crop (or shares in the proceeds therefrom)...."

We fail to see how the indictment was amended. Contrary to the district court's conclusion, the defendants were not convicted because they caused false statements to be made concerning the tenants' status as "separate persons." The government's proof concerning the separate person requirement was necessary to show Wayne and Ralph Huntsman's motivation for pursuing the scheme. Had there been no $50,000.00 per person limitation on payments, it would not have been necessary for them to recruit the tenants to apply for the program. Also, proving that the tenants were not separate persons shows how the defendants intended to obtain something of value from the CCC. *See Jacobs v. United States, infra.* Finally, proof that one is not a producer may overlap somewhat with proof that one is not a separate person. A producer is one who shares in the risks of producing a crop or shares in the proceeds therefrom, while one element of being a separate person is having a separate and distinct interest in the crop.

The indictment alleged the false statements to be the tenants' representations of themselves as producers. The proof tended to show that they were not producers. The jury instructions on Counts II through VII conformed to these charges, noting that the statements at issue were Long's, Crowder's, Mason's, and Parks' representations that they would be producers. Since the material elements addressed in the proof and in the jury instructions matched those charged in the indictment, the indictment was not amended.

Similarly, we perceive no fatal variance. As described above, the indictment put Wayne and Ralph Huntsman on notice that the prosecution would try to prove that the four tenants misrepresented their status as producers when each signed the Contract to Participate. The evidence offered by the government conformed to these charges. It tended to show that Long, Crowder, Mason and Parks represented themselves as producers when each signed the Contract. The evidence also tended to show that the statements were false because none of the four qualified as producers entitled to share in the crops, either because they would not farm the leased land or have it custom farmed for them,[4] or because they would not share in the risks and benefits of farming the land because Wayne and Ralph Huntsman would manipulate the transactions. We therefore conclude that the facts proved at trial did not materially vary from those alleged in the indictment.

### III.

When reviewing the grant of a motion for judgment of acquittal, we view the evidence in the light most favorable to the prosecution, *United States v. Mundt,* 846 F.2d 1157, 1158 (8th Cir.1988), and give the prosecution "the benefit of all inferences that may reasonably be drawn in its favor." *United States v. Rodriguez,* 812 F.2d 414, 416 (8th Cir.1987). "[A] motion for a judgment of acquittal should be denied when ... there is substantial evidence

---

**4.** One need not physically perform farm labor to participate in the program. One could hire another to farm the land so long as the compen- sation for the work was not dependent on the amount of the crop produced. *See* 7 C.F.R. § 795.16 (1984 and 1985).

justifying an inference of guilt as found irrespective of any countervailing testimony that may be introduced." *Id.* at 416. The motion should be granted "only where the evidence ... is such that a reasonably minded jury must have a reasonable doubt as to the existence of any of the essential elements of the crime charged." *Mundt,* 846 F.2d at 1158. The evidence need not, however, exclude every reasonable hypothesis besides guilt. *Id.* The essential elements for a conviction under 15 U.S.C. section 714m(a) are 1) a statement; 2) that is false; 3) the defendant knows it to be false; and 4) the defendant makes it for the purpose of either influencing action of the CCC or obtaining something of value under an act applicable to the CCC. *Jacobs v. United States,* 359 F.2d 960, 963 (8th Cir.1966).

█ The district court found the evidence insufficient because, under the lease agreements, the tenants were contractually bound to share the risks and entitled to share the proceeds from farming operations on the leased land. Since Long, Crowder, Mason and Parks necessarily qualified as producers because of the lease contracts, the district court concluded that there was insufficient evidence to prove that Wayne and Ralph Huntsman had caused any false statements to be made. The district court also found the evidence insufficient to prove that Wayne and Ralph Huntsman had any criminal intent when they urged the tenants to enter into the lease agreements.

On the face of the lease agreements, Long, Crowder, Mason and Parks were entitled to keep whatever they produced on the leased land. Their only obligation was to pay cash rent or, in Parks' case, a share of the crop and expenses. If the lease agreements were a false front, however, such that the four tenants were not entitled to share in the proceeds, they would not qualify as producers. *See United States v. Thomas,* 593 F.2d 615, 619–20 (5th Cir.1979) (evidence of sham nature of transactions sufficient to show individuals not entitled to receive government benefits, and thus statements to the contrary were

false, even though paper structure indicated that the individuals were entitled), *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980). Similarly, the tenants would not qualify as producers if they never intended to farm at all, or have the land custom farmed for them.

We deem it unnecessary to recount the facts set forth above. The evidence is clear that Long and Mason never intended to farm the land subject to their "leases." Neither intended to share, and neither in fact shared, in the crop produced. As to Crowder and Parks, the record reveals a consistent pattern by which, at the direction of Wayne and Ralph Huntsman, the proceeds from the crops were funneled to Wayne Huntsman, Ralph Huntsman, or Huntsman Farms. When viewed in the light most favorable to the prosecution, the evidence supports the inference that the four tenants were not producers, because they never shared or were intended to share in the crop proceeds. The evidence thus supports the conclusion that the four tenants made false statements when they represented themselves as producers on the Contracts to Participate.

Likewise, the evidence also supports the jury's finding that Wayne and/or Ralph induced each tenant to sign the Contract to Participate as charged in Counts II through VII. Again, we deem it unnecessary to recount the evidence described above. Suffice it to say that none of the tenants would have signed the Contract to Participate had he not been asked to do so by the Huntsmans.

The judgment dismissing the indictment is reversed. The judgment of acquittal on Counts II through VII is likewise reversed, and the case is remanded to the district court with directions to reinstate the jury's verdict on those counts.