HUNTSMAN FARMS, INC., Keith Huntsman, Howard Huntsman, Wesley Huntsman, and Tommy Wachtel, Plaintiffs,

v.

Mike ESPY, Secretary, United States Department of Agriculture, Defendant.

No. LR–C–94–507.

United States District Court,
E.D. Arkansas,
Western Division.

Jan. 4, 1996.

Samuel A. Perroni, Little Rock, AR, for plaintiffs.

Richard M. Pence, Jr., Assistant U.S. Attorney, Little Rock, AR, for defendant.

## ORDER

ROY, District Judge.

The instant case is an action for judicial review under the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*, and seeks a determination that certain decisions by the Agricultural Stabilization and Conservation Service ("ASCS") of the United States Department of Agriculture pertaining to eligibility for and payment under the Payment Limitation Regulations, 7 C.F.R. Part 795, were arbitrary and capricious.

More specifically, the complaint indicates that the plaintiffs are seeking a declaratory judgment that:

(1) Wesley Huntsman is a "separate person" as defined by the applicable regulations, and thus, should receive full deficiency payments for 1986 and 1987;

(2) Tommy Wachtel is a "separate person" and should also receive all of his deficiency payments for 1986 and 1987;

(3) Huntsman Farms, Inc., along with Harold and Maudie Huntsman, should be considered a "separate person" which has *not* engaged in a plan to circumvent the limitations on payments, and thus, should receive all of its deficiency payments for 1986 and 1987;

(4) Plaintiffs Keith, Howard, and Wesley Huntsman, and Tommy Wachtel are due interest under the Prompt Payment Act for their failure to receive their deficiency payments for 1987 in a timely manner; and

(5) The plaintiffs are due attorney fees under the Equal Access to Justice Act.

## I.

### Factual and Procedural History

A review of how the several plaintiffs are related, by blood and by business, is appropriate. The source of this factual narrative is the administrative record filed with the Court. It is intended to provide the context in which this case arose and in no way represents independent findings of fact by this Court.

Over the past several years, Harold and Maudie Huntsman gradually acquired and farmed what came to be thousands of acres of land in White County, Arkansas. They eventually incorporated Huntsman Farms, Inc. ("HFI"), each owning 50% of the corporation (R. 419), with the corporation taking title to the land.[1] HFI is the entity which "runs the farm," or at least the portion of the corporation's acreage which was not leased out to other people.[2] In addition to the farm, HFI also owned Huntsman Granary and Huntsman Farm Store, the latter selling and servicing farm equipment and other materials to many customers throughout the area.

Mr. and Mrs. Huntsman have two sons, Wayne and Ralph, who are farmers and who both worked the family land. Ralph Huntsman and a Mr. Roger Long each owned, at all times pertinent, 50% of Double R Farm Supply, a local farm supply store.

Wayne and Ralph also have children that have been involved in the farming of HFI property; Wayne's sons Howard and Keith, and Ralph's son Wesley. Another plaintiff is Tommy Wachtel, a friend of the Huntsman family.

An agency within the United States Department of Agriculture, the Agricultural Stabilization and Conservation Service ("ASCS"), oversees a variety of federal government farm programs, including those which essentially pay farmers an annual fee for holding acreage out of production for a time.[3] In certain programs, Congress has by statute limited the amount of payments that one "person" (as defined by regulation) may receive per year to $50,000.00. 7 U.S.C. § 1308. A "person," under the applicable regulations, can be an individual, a business partnership, a corporation, or other legal entity, but each such "person" must be a single,

---

1. In the years pertinent to this appeal, 1984 to 1987, no one owned any of the stock except Harold and Maudie. (R. 419)

2. HFI owned 13,000 to 14,000 acres from 1984–1987 (R. 1583).

3. A brief overview of the regulatory scheme related to the issues brought before this Court would be helpful at this time. Excerpts from an excellent summary on the subject are from *Olenhouse v. Commodity Credit Corporation*, 42 F.3d 1560 (10th Cir.1994):

> The Commodity Credit Corporation Act, enacted in 1948 and codified at 15 U.S.C. § 714 (1988), authorizes the Commodity Credit Corporation (CCC) to support farm prices as determined by the Secretary of the United States Department of Agriculture (USDA). Specific price support programs were enumerated by Congress in the Agricultural Act of 1949, 7 U.S.C. § 1421 *et seq.*, which authorizes the Secretary of the Department of Agriculture to deliver price supports under those programs through the CCC. *See* 7 U.S.C. § 1421(a) (1988).

> The general administration and supervision of price support programs in the field has been delegated by the Secretary to the ASCS. 7 C.F.R. §§ 713.2, 1421.2 (1987) [*footnote omitted*] (feed grain, rice, cotton, wheat and related programs). Thus, the CCC holds the purse strings and the ASCS runs the programs. Different sets of regulations govern the conduct of each. * * *
> The ASCS administers price support programs through a network of committees. * * *
> Three levels of authority exist under the ASCS committee structure.... At the local and state levels, USDA programs are administered by local, county and state ASCS committees.... At the federal level, ASCS' Deputy Administrator for State and County Operations (DASCO) *supervises state committees.* 7 C.F.R. § 7.1. Decisions of the Deputy Administrator constitute final agency action and are subject only to judicial review. 7 C.F.R. § 7.33.
> *Olenhouse*, 42 F.3d at 1566–67.

economically independent unit as set forth and defined in the regulations.[4]

Harold and Maudie's corporation, HFI, along with their five sons and grandsons mentioned above, Wayne, Ralph, Howard, Keith, and Wesley, had all participated in such a payment limitation program in 1984 and 1985. All six producers had been classified as separate "persons" and received separate payments in each of those two years.

All six producers applied for payments in 1986, along with Tommy Wachtel, a friend of the family who was now leasing HFI land. Sometime in the year, advance deficiency payments were frozen to all producers in Arkansas because of questions concerning the way the program was being administered. About the same time, the government began to investigate the status of all producers leasing land from HFI who were enrolled in the payment limitation program. This included Wachtel and the several Huntsmans listed above, along with several other folks who leased acreage on the big Huntsman farm. Essentially, the government was questioning whether the several people farming HFI land were sufficiently "independent" to be entitled to separate "person" status under the program and thereby each entitled to a separate payment.

Though the 1986 payment freeze was rescinded in August of that year as to Arkansas producers in general, payments to farmers under investigation, like Wachtel and the Huntsmans, were not released. Despite not having received the payments, the Huntsmans and Wachtel continued farming and applied again for payments in 1987.

Despite repeated requests from the farmers for a decision, and repeated "assurances" from one administrative entity or another that a decision was forthcoming, no determination on the "person" question was rendered until October of 1987. That decision was that all the producers working the HFI land, with the exception of a Jimmy Mason, were determined to be one "person" for limitation payment purposes for the years 1986 and 1987 (R. 2077). These producers included HFI, Harold and Maudie Huntsman, Ralph, Wayne, Howard, Wesley, and Keith Huntsman, Tommy Wachtel, James and Steve Cain, and Roy Crowder. No legal support was offered in support of those findings.

After Roy Crowder submitted additional evidence, he was determined to be a separate person and the decision was reversed as to him. Wachtel and the Huntsmans, by one means or another, appealed the decision to the state ASCS committee. After that appeal was denied, with findings, in March, 1988, Wachtel and the Huntsmans began a long, drawn out appeal to the Deputy Administrator, State and County Operations ("DASCO"), which culminated in a hearing in Washington, D.C. on October 8, 1991.

On May 13, 1992, DASCO determined that the plaintiffs to this action were ineligible for payments for the following reasons:

(1) Wayne and Ralph Huntsman, HFI, Harold Huntsman, Wesley, Keith, and Howard Huntsman, and Tommy Wachtel were all willing participants in a scheme or device to evade payment limitations. (R. 67).

(2) Wesley Huntsman was not independent of his father Ralph because Wesley did not pay his bills to Double R Farm Supply, the store owned "50/50" by Ralph Huntsman and Roger Long, on a monthly basis. Ralph was thus considered to be impermissibly "financing" Wesley. Similarly, Wesley was adjudged not to be independent of HFI because Wesley did not pay his bills to the Huntsman Farm Store (owned by HFI) on a monthly basis. (R. 56).

(3) Tommy Wachtel was combined with HFI and the other Huntsmans because his machinery was purchased on credit from the Huntsman Farm Store, because he still owed HFI money for land he had leased from HFI, and because there was insufficient evidence in the record to find that he exercised separate responsibility for his interest in the farming operation. (R. 57).

---

4. The regulations having to do with the 1986 and 1987 crop years are found at 7 C.F.R. Part 795. (The payment limitation regulations are found at 7 C.F.R. Part 1497 and have been amended significantly.) All references in this order to applicable regulations will be for those two years unless otherwise noted.

Wachtel and the Huntsmans requested reconsideration of the 1992 decision and submitted additional information, including part of the transcript from the criminal trial of *United States v. Wayne Huntsman and Ralph Huntsman,* No. LR–CR–88–151.[5] DASCO sustained its prior determination in a decision issued March 29, 1993. The following reasons were given for upholding the 1992 determination:

(1) HFI, the Huntsmans, Tommy Wachtel, the Cains, Roy Crowder, and Jimmy Mason participated in a scheme designed to avoid payment limitations. (R. 23).

(2) Because only a partial transcript was submitted, DASCO found that reliance on it would be misplaced, and accordingly concluded that nothing in the transcript, as presented, could justify changing the prior determination. (R. 23).

Later that year, October 15, 1993, counsel for the plaintiffs wrote a letter to the acting Administrator of the ASCS requesting another administrative review, arguing that Ralph and Wayne's convictions in federal court regarding the 1984 and 1985 crop years had probably tainted DASCO's decision regarding the other Huntsmans and Wachtel about the 1986 and 1987 crop years. In an effort to settle the case, counsel said Ralph and Wayne would drop their respective claims. (R. 8–9).

Mr. Grant Buntrock, the Administrator of ASCS, in fact reevaluated the plaintiff's claims and issued a revised determination on January 13, 1994. The 1992 and 1993 DASCO determinations were modified to reflect that Wesley, Keith, and Howard Huntsman, and Tommy Wachtel, did *not* participate in a scheme or device for the 1986 and 1987 crop years, and that Howard Huntsman and Keith Huntsman were separate persons for payment limitation purposes.

However, this 1994 determination also found that Wesley Huntsman and Tommy Wachtel would continue to be considered "combined" with each other and the remaining Huntsmans, and HFI, for the 1986 and 1987 crop years. (R. 3). The determination also said that there was no reason to change the finding that HFI and Harold Huntsman had engaged in a scheme designed to avoid payment limitations.

With regard to the determination combining Wesley Huntsman and Tommy Wachtel as one person for payment limitation purposes, the Administrator offered the following reasons:

(1) Wesley Huntsman did not furnish evidence of a bank loan to finance his farming operation and because he stated on a government form that his father Ralph and his uncle Wayne extended him credit. (R. 5). The Administrator also stated:

> In the case of Wesley Huntsman, the only adverse finding made by DASCO was that he did not pay his bills monthly to the Huntsman stores. There is no evidence that the credit arrangements between Wesley and these stores were not normal and customary. This does not appear to be a strong basis for a restrictive determination.

(R. 5).

(2) Tommy Wachtel admitted that he still owed HFI $50,000.00 to $60,000.00 in overdue lease payments for the 1986 and 1987 crop years. (R. 6).

The decision of January 13, 1994, also stated:

> Based on a review of the evidence in the Administrative Record, there is no evidence to support that [plaintiffs Keith Huntsman, Howard Huntsman, Wesley Huntsman, and Tommy Wachtel] participated in this scheme. The evidence in the Administrative Record indicates that they

---

**5.** Ralph and Wayne faced criminal charges due to their purported involvement in a scheme to fraudulently obtain extra crop payments for the years 1984 and 1985. They were acquitted on a conspiracy count, but were convicted on six counts of inducing four of their tenants to make misrepresentations to the government for the purpose of obtaining crop payments to which they were not entitled. The trial judge then set aside those convictions. The Government appealed and the Eighth Circuit ordered the convictions reinstated. *U.S. v. Huntsman,* 959 F.2d 1429, *cert. denied,* 506 U.S. 870, 113 S.Ct. 201, 121 L.Ed.2d 143. The two were subsequently sentenced to probation. None of the four tenants in question is a party to this civil action.

each actively participated in their farming operations and maintained a separate interest in the crops.

(R. 4).

The January 13, 1994, decision concluded the administrative proceedings. Thus, when the "smoke cleared" after that decision was issued, the parties stood as follows:

● Wayne and Ralph Huntsman had dropped their claim for payments for 1986 and 1987;

● Howard and Keith Huntsman had been found to be separate persons for payment purposes for those years and eventually were duly paid;

● Wesley Huntsman and Tommy Wachtel were found not to have been engaged in any improper "scheme or device" and were accordingly entitled to receive deficiency payments, but were found to be not sufficiently independent of HFI or each other to receive separate payments. Thus, they were found to be entitled to split a $50,000 payment for 1986 and another for 1987.

● Harold and Maudie Huntsman were found to be combined with HFI and were further found to have engaged in a scheme or device to improperly receive limitation payments.

The plaintiffs herein filed suit in district court in which they demand the following:

(1) a finding that the agency's final determinations were arbitrary, capricious, etc., which legally constituted an abuse of discretion;

(2) a finding that Wesley Huntsman and Tommy Wachtel are separate persons under the law and are each entitled to a full payment for both 1986 and 1987;

(3) a finding that though HFI, Harold Huntsman, and Maudie Huntsman should be considered one "person" for payment purposes, they did not engage in a scheme or device in an attempt to improperly receive payments, and that they should receive a $50,000 payment for 1986 and another for 1987;

(4) interest for all the plaintiffs under the Prompt Payment Act for payments due them

on March 2, 1988, relating to their participation in the 1987 program; and

(5) attorneys fees under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504, *et seq.*

## II.

### *Legal Standard of Review*

Essentially, the claims of the plaintiffs are based on the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. "Section 701 of the APA provides that agency action is subject to judicial review except where there is a statutory prohibition on review or where agency action is committed to agency discretion as a matter of law." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1572 (10th Cir.1994). The Court finds that there is no statutory bar against reviewing the defendant's decision. It is well settled that 7 U.S.C. § 1385:

> is not a complete bar to judicial review of agency action related to farm program payments. [citations omitted] Although factual determinations of an agency are not subject to judicial review under section 1385, we are free under the APA to review legal questions or agency action asserted to be arbitrary or capricious. [citations omitted]
>
> Similarly, regulations covering appeals of agency determinations in specified farm programs, ... do not preclude all judicial review of farm program payment decisions. Instead, these regulations limit the extent of review available within the administrative agency.

*Madsen v. Dept. of Agriculture,* 866 F.2d 1035, 1036–37 (8th Cir.1989). The Court has reviewed the nature of the plaintiffs' claims and concludes neither § 1385 nor the regulations governing agency appeals prevents review of those claims under the APA.

The duty of a court reviewing agency action under the "arbitrary or capricious" standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43 [103 S.Ct. 2856,

2866–67, 77 L.Ed.2d 443] (1983). In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment. *Id.* (citing *Overton Park [v. Volpe]*, 401 U.S. [402] at 416 [91 S.Ct. 814 at 823–24, 28 L.Ed.2d 136] [ (1971) ]. Agency action will be set aside if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. at 2867.

\* \* \* \* \* \*

Because the arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the actual decision, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.*, 463 U.S. at 50 [103 S.Ct. at 2870]. Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record.

*Olenhouse*, 42 F.3d at 1574–75.

In addition to requiring a reasoned basis for agency action, the "arbitrary or capricious" standard requires an agency's action to be supported by the facts in the record.

When the arbitrary or capricious standard is performing that function of assuring factual support, there is no *substantive difference* between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a "nonarbitrary" factual judgment supported *only* by evidence that is not substantial in the APA sense. . . .

*Ass'n of Data Processing v. Bd. of Governors*, 745 F.2d 677, 683–84 (D.C.Cir.1984) (then-Judge Scalia writing).

**6.** The Huntsman stores were the Huntsman Farm Store, owned by HFI, and Double R Farm

## III.

### *Limitation Payments*

#### A. *Wesley Huntsman*

■ As mentioned above, the agency determined, by way of the Administrator's January 13, 1994, modifications of the DASCO's determinations of 5–13–92 and 3–9–93, that Wesley Huntsman and Tommy Wachtel did *not* "adopt or participate in a scheme or device for the 1986 and 1987 crop years," (R. 3) and accordingly would be eligible for some amount of limitation payment, *but* they would "remain combined with each other and the other members of the Huntsman 1986 and 1987 crop year farming operation as one person for payment limitation purposes." (R. 3) The Administrator declared his modifications to be "the agency's final determination in this matter." (R. 3).

Thus, Wesley and Tommy remained part of a pool of payment applicants of which they were the only parties eligible to receive any payment. They therefore split the $50,000 paid for 1986 and the $50,000 paid for 1987. Neither was found to be independent of HFI or the other Huntsmans lumped together in the pool.

7 C.F.R. § 795.3 requires that in order to be treated as a separate person for payment purposes, the entity must demonstrate that it (1) has a separate, distinct interest in the land or crop involved; (2) exercises separate responsibility for its interest; and (3) is responsible for the cost of farming related to such interest from a fund or account separate from that of any individual or entity.

In his January, 1994, decision, the Administrator apparently abandoned the agency's earlier determination that since Wesley "did not pay his bills monthly to the Huntsman stores," [6] he was being improperly financed by their owners, and thus not independent. "There is no evidence that the credit arrangements between Wesley and these stores were not normal and customary." (R. 5).

Supply, owned jointly by Roger Long and Ralph Huntsman.

Instead, he offered these reasons to justify the agency's position that Wesley was not independent of HFI and other Huntsmans:

(1) "Wesley did not obtain a bank loan to fund his operation." (R. 5)

(2) "There is no evidence to indicate the source of his operating funds." (R. 5)

(3) "According to his [Form] 561 in 1987, Wesley was financed by Ralph and Wayne extending him credit." (R. 5)

(4) "No bank records or accounting have been provided to establish that Wesley actually financed his operation in this matter." (R. 5)

The Administrator concluded that "[a]s a result, Wesley Huntsman failed to meet his burden of establishing that his farming operation was funded by a fund or account separate from others." (R. 5)

Wesley suggests that it is significant that, but for what the Court has identified as reason # 3, the reference on Wesley's Form 561 to "financing," none of the reasons offered by the Administrator in his 1994 ruling had ever been offered in the previous seven years of appeals. For example,

(1) on October 20, 1987, Wesley was informed that the State Office had combined him with all the other Huntsman entities because he was one of several "tenants on the farm, [therefore] an [impermissible] financing tie exists." (R. 2072)

(2) on March 8, 1988, in a letter from the acting state director of the ASCS, Wesley was combined with Ralph Huntsman because he was being "provided credit by Double R Farm Supply, owned by Ralph Huntsman," since he was not paying his store bill monthly, and because he had listed Wayne Huntsman and HFI as entities who had provided him with financing. (R. 1926)

(3) on May 12, 1992, DASCO determined "[b]ecause [Wesley] did not pay these accounts in a timely manner he cannot be considered to be responsible for the cost of his farming operation separate from the corporation from which he rents or from his father, Ralph Huntsman, who also has a farming interest in the farm," and therefore should be combined with the others.

(R. 56) He also determined that Wesley was one of several "willing participants" in a plan or scheme to wrongfully obtain payments, and was therefore ineligible on that basis. (R. 67)

(4) on March 29, 1993, DASCO affirmed its earlier determination that Wesley should be combined with the other Huntsmans and that all had participated in the "scheme or device," without listing any reasons which were unique to Wesley. DASCO repeated that the several Huntsmans had violated the "financing rule" by obtaining credit at the Huntsman stores. (R. 16–23)

It is true that, in the 1994 decision of the Administrator, only the matter of improper financing by persons connected with HFI had been previously mentioned by the agency as justification for denying Wesley independent status. The "financing" by Ralph Huntsman was related to his co-ownership of Double R Farm Supply. The Administrator suggests the credit extended to Wesley was typical of that extended to other farmers in the area and was insufficient to sustain a finding that said activity violated the so called financing rule.

In the event this Court has misread the Administrator's finding, the Court nevertheless finds persuasive the reasoning of the court in *Golightly v. Yeutter,* 780 F.Supp. 672 (D.Ariz.1991), which held *inter alia,* that even if the providing of financing can be justified under the applicable statutes, regulations, etc. for finding two or more entities to be one person for limitation payment purposes, the exception provided for banks and other commercial lenders should be extended to other business entities which customarily extend credit as a normal part of their business. In the *Golightly* case, it was cotton gins; in the instant case, it includes farm supply stores like Double–R. Thus, being given credit from the Farm Store or Double–R did not violate the "financing" rule.

With regard to the Administrator also noting that Wayne Huntsman was also listed by Wesley on his form ASCS–561 as someone who had extended him credit (R. 5), the only evidence in the administrative record on that

point is the form itself. The explanation is in the record as well. Wesley initially filled out and signed his form for the 1987 crop year on March 26, 1987. (R. 429AG) At the request of the County Executive Director, Neal Gregory, Wesley provided additional information on September 24, 1987. (R. 429AG)

In the financing section of the form, the following was among the information added by Wesley:

Huntsman Farm Store, Wayne Huntsman, and Ralph Huntsman give me credit on my farm expenses and account until our crops are harvested each year.

Wesley testified that he was under the impression, mistakenly, he later learned, that Wayne owned part of Huntsman Farm Store. Neal Gregory suffered from the same misunderstanding and even told Wesley that since Wayne Huntsman was "part of Huntsman Farm Store," if Wesley was extended credit by the store, then Wayne was "financing" Wesley like Ralph and HFI were. (R. 429A, 429AK).

There is *nothing* in the Administrative Record which contradicts Wesley's explanation of why he included Wayne's name on the form. The Court therefore finds that the Administrator's determination that Wesley was improperly financed by Wayne is contrary to the evidence in the record, and is adjudged to be a "arbitrary finding."

However, the Court now addresses the other reasons cited by the Administrator for finding that Wesley was not independent of HFI and the other Huntsmans:

Wesley did not obtain a bank loan to fund his operation. There is *no evidence to* indicate the source of his operating funds. For the 1986 crop year, Wesley claims that he financed his operation with $25,000 in savings.... No bank records or accounting records have been provided to establish that Wesley actually financed his operation in this manner.

(R. 5).

Wesley argues that the government maintained, for the longest time, that he was in on some large scale scheme with the other Huntsmans to cheat the government; at various stages of the various proceedings, some-

one looking at the appeal would cite the extension of credit at the farm store; but no one considering Wesley's several appeals had ever cited a lack of "bank or accounting records" as a reason for combining him with other Huntsmans until the Administrator's 1994 opinion. At that point, Wesley argues, it became too late to submit additional documentation—the administrative process was over.

This "unfair to the point of being arbitrary" argument is undercut, the Court believes, by the fact that the regulations require an applicant for these payments to show he meets those requirements, and one such requirement is that the farmer be an independent producer. Thus, the burden rests with the farmer to do what is necessary to show he meets the eligibility requirements. *No later than when Wesley and the others were combined by the state committee, was Wesley explicitly put on notice that his independence as a producer was in question.* When DASCO went further and accused Wesley and the others in May, 1992, of participating in a scheme or device to "beat the system," that determination was obviously based on DASCO's position that the other farmers on the HFI farm were not independent of HFI and/or Wayne and Ralph. The best way to refute DASCO's determination would be to submit good financial records showing that one actually was an independent producer. Wesley never did that.

Furthermore, the Court is of the opinion that Wesley's argument misstates the Administrator's analysis. The Administrator did not hold against Wesley *because* he did not submit proper documentation, per se. Rather, he cited the lack of documentation as evidence consistent with his holding that Wesley had not met his obligation to show that he was funded from a source separate from the others, i.e., that he was in fact an independent producer.

The Court holds that the reasons offered by the Administrator for leaving Wesley combined with Tommy Wachtel and HFI were not indicative of some brand new requirements being foisted upon Wesley. Rather, the Administrator was merely point-

ing out how Wesley had failed to meet an obligation he had carried all along.

The Court finds that the Administrator's "bottom line" determination that Wesley was not separate is supported by substantial evidence in the record.

### B. Huntsman Farms, Inc.

■ Before the claim of HFI and its owners, Harold and Maudie,[7] can be addressed on its merits, the Court will first note the Government's assertion that HFI has waived any right to appeal the agency's determination to this Court. The government asserts that HFI/Harold & Maudie did not join Wesley, Tommy, Keith, and Howard in their appeal to the Administrator after the final DASCO decision. In fact, the government asserts that "Huntsman Farms, Inc. never requested payment in the administrative process, although it now claims its entitlement." *Defendant's brief in support of summary judgment,* at 17.

The Court finds there is no need to address that interesting argument because, in any event, sufficient evidence exists in the administrative record to support the agency's determination that HFI adopted or participated in adopting a scheme or device designed to evade the rules governing payments found in 7 C.F.R. Part 795.

Counsel for the plaintiffs argues that there is next to nothing in the 1992 and 1993 DASCO and 1994 Administrator's determinations linking Harold or Maudie Huntsman with any improper scheme or device and, strictly speaking, he is correct as far as this Court can tell. In the 1992 DASCO decision, there were no findings of fact having to do with either Harold or Maudie individually. The first mention of either of them is found at pp. 12–13 of the report (R. 57–58), where DASCO correctly points out that the couple must be combined with HFI as a "person." When the DASCO got around to citing the reasons and evidence for holding that an improper "scheme or device" was employed,

Harold and Maudie were *never mentioned.* Not until the next-to-last paragraph of the report is Harold painted guilty, with the broadest of brushes:

> In summary, we have determined that Wayne Huntsman and Ralph Huntsman were the primary participants in the scheme or device. However, *the record is clear* that HFI, Harold Huntsman representing HFI, Wesley Huntsman, Keith Huntsman, [et al.] were all willing participants, having full knowledge of the scheme or device.

(R. 67) (emphasis added) (internal footnote omitted).

This conclusory statement is not backed up by a single example of Harold, representing HFI or otherwise, planning, effecting, or even having knowledge of, any "scheme or device."

Similarly, the shorter DASCO report of March, 1993, finally mentions Harold and Maudie on its final page when it determines that they should be combined with HFI and the other Huntsman entities for payment limitation purposes. Consider this "exhaustive" account of their "scheming" activities:

> ... "Further, Huntsman Farms, Inc., Harold Huntsman representing Huntsman Farms, Inc., Wayne Huntsman [et al.] ... each adopted or participated in adopting a scheme or device ... to evade ... the payment limitation regulations...."

(R. 23).

Finally, there is the Administrator's report of January 13, 1994. At the end of a paragraph referring specifically to the actions of Wayne and Ralph, but sometimes using the collective noun "Huntsmans," the Administrator concludes: "For these *and the other reasons specified in the DASCO determinations,* there is no basis to modify the scheme or device determination affecting Huntsman Farms, Inc. (HFI), Ralph Huntsman, *Harold Huntsman,* and Wayne Huntsman." (R. 4) (emphasis added) As mentioned above, *there*

---

7. Mr. and Mrs. Huntsman have never asserted a right to separate person status apart from that of the company, Huntsman Farms, Inc. Of course, that is consistent with 7 C.F.R. § 795.8(a), which provides, in pertinent part:

[A] corporation in which more than 50 percent of the stock is owned by an individual (including the stock owned by the individual's spouse, ...) ... shall not be considered as a separate person from such individual....

*were no* reasons "specified in the DASCO determinations."

Were Harold and Maudie Huntsman actions being judged in a different context, this Court's determination that there is not substantial evidence in the record to sustain the agency's determination that Harold had utilized a "scheme or device," and that said determination should be, and hereby is, deemed "arbitrary and/or capricious," might be of greater significance. However, it is the actions of the corporate entity which they own, HFI, which matter.

People other than a corporation's owners or officers give life to a corporation. "As an inanimate entity, a corporation must act through agents." *Commodity Futures Trading Com'n v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) Though DASCO and the Administrator did not use the term "agent" to describe Wayne Huntsman *vis-a-vis* HFI, they might as well have. Taken as a whole, their determinations describe a situation where, for all practical purposes, Wayne Huntsman *was* HFI. There is ample evidence in the record to support such a conclusion, if that evidence were found to be credible by the agency.

For example, the assistant supervisor in the White County ASCS office, stated that Wayne acted as the representative for all of the operators on the HFI land. (R. 1077) She further testified that even after Ralph and Wayne had told her they were no longer associated with HFI in any way, they continued to represent themselves as such when dealing with the local office (R. 1079–80). The President of the Bank of McCrory stated that Wayne had signatory power along with Harold Huntsman on the HFI bank account, as well as the Huntsman Farm Stores, Inc. bank account (along with Ralph and Maudie). (R. 1048–49).

Roy Crowder was a tenant of HFI who worked hourly on the Huntsman land for almost 20 years. He stated that for a number of years prior to his leaving the place in late 1987, Wayne and Ralph had run HFI due to Harold and Maudie's advanced years.

(R. 1822) He also stated that Ralph talked him into joining the ASCS price support program in 1984. He remained in the program through 1987. During that time, he said he never exercised any independent authority over his rice crops—Ralph and Wayne did everything, including all the paperwork and banking. At harvest, all his rice was put in the HFI granary for drying and storage at Wayne and Ralph's direction. Though the grain was co-mingled with the rice of other HFI tenants, he never recalled receiving a weigh ticket. Whenever he received a deficiency check or a loan check from ASCS, almost invariably, Wayne or Ralph would tell him that he owed that precise amount to HFI for production expenses.[8]

Wayne ran the HFI granary and handled all the rice sales for HFI. Wayne and Ralph ran the HFI owned Farm Supply Store.

There is substantial evidence in the record to support the agency's determination that Wayne and Ralph were trying to improperly evade the $50,000 per person limit in violation of the applicable regulations. When they were doing so, they were "wearing their HFI hats." Accordingly, it was appropriate for the agency to find that HFI, the corporate entity, adopted a scheme or device to evade the rules of Part 795.

## C. *Tommy Wachtel*

■ The Court finds that substantial evidence exists in the record to support the Administrator's determination that Tommy Wachtel should be combined with HFI. Like Wesley, he has failed to show that he had a source of financing separate and independent from the HFI group. In fact, the record is replete with evidence which would support a finding that Tommy, perhaps unwittingly, was little more than an absentee figurehead. Wayne called all the shots as far as running the farm, made all the applications for government benefits (benefits which Tommy was totally unfamiliar with), told Tommy what checks to write, in some cases, filling in blank checks himself, and in all respects manipulat-

---

8. Mr. Crowder's credibility was called into question by the plaintiffs, but credibility questions are for the agency to resolve, provided of course that

there is substantial evidence in the record to support such a credibility assessment.

ing the arrangement with Tommy so to make HFI eligible for an additional limitation payment. The Administrator's determination will not be disturbed.

## IV.

### *Interest/Prompt Payment Act*

■ Plaintiffs Keith Huntsman, Howard Huntsman, Wesley Huntsman, and Tommy Wachtel argue that since they finally prevailed on their claims for deficiency payments, the government now owes them interest. Of course, interest cannot be ordered against the United States government unless it has made an express waiver of sovereign immunity to that effect. *Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). The authority on which the plaintiffs rely is the Prompt Payment Act, 31 U.S.C. § 3901 et seq., read in conjunction with Rural Development, Agricultural and Related Agencies Appropriation Act for Fiscal Year 1988 ("RDA"); see Pub.L. 100–202.

■ The parties are in agreement that interest is only available, if at all, for the payments relating to the 1987 crop year; plaintiffs do not seek interest on the 1986 payments. Title 31 U.S.C. § 3902(h)(2)(A) provides, in part:

> In the case of a payment to which producers on a farm are entitled under the terms of an agreement entered into under the Agriculture Act of 1949 (7 U.S.C. § 1421 *et seq.*), an interest penalty shall be paid to the producers if the payment has not been made by the required payment or loan closing date.

This portion of the Act was added by amendment in October, 1988. Prior to that time, no part of the Act covered farmers receiving deficiency payments. When this amendment was passed, Congress provided that "[t]he amendments [amending subsec. (h) of § 3902] shall be applicable with respect to all obligations incurred on or after January 1, 1989." Act Oct. 17, 1988, P.L. 100–496, § 14(c), 102 Stat. 2465. Plaintiffs concede that the Act, by itself, was amended too late to cover them and their 1987 crop payments.

However, in a Continuing Resolution passed by Congress in December, 1987, Pub.L. 100–202, the Commodity Credit Corporation was among several governmental entities receiving administrative and/or operating expenses. In the portion of the appropriations bill dealing with the CCC, the act provided:

> *Provided further,* That notwithstanding any other provision of law, the Commodity Credit Corporation shall pay an interest penalty, *determined on the basis of the provisions of the Prompt Payment Act* (31 U.S.C. 3901 et seq.), on the amount of all payments and price support loans which the Commodity Credit Corporation is obligated to make if payment is not made by the required payment date. *This provision shall be applicable to all such payments for obligations incurred after January 1, 1988.*

P.L. 100–202, 101 Stat. 1329–336 (emphasis added).

The issue for the Court thus becomes whether the government's "obligation" to pay the plaintiffs their deficiency payments was "incurred after January 1, 1988," as asserted by the plaintiffs, or in 1987 as maintained by the agency. Perhaps not surprisingly, the Commodity Credit Corporation interpreted this legislation to cover the 1988 crop year and those following:

> 1–A) Late payment interest will be paid for obligations incurred after January 1, 1988, *for the 1988 crop year.*

> B) No "payment due dates" have ever been established for most farm programs because CCC has never been required to pay interest penalties on these types of payments.

> 2. This notice:

> A) Advises all offices of national payment due dates for ... payments effective for obligations incurred after January 1, 1988, (*1988 crop year*).

> B) *Does not apply to payments for the 1987 and previous crop years.*

Memo from ASCS (Washington) to State and County ASCS offices, July 25, 1988.

The Court finds no guidance in P.L. 100–202 itself for determining precise "due dates" for deficiency payments. This was remedied in October, 1988, when the Prompt Payment Act was amended to include deficiency payments; subsection (h) provides for the calculation of due dates. The plaintiffs suggest that, since the appropriation bill provided that interest penalties were to be determined on the basis of the Prompt Payment Act, the Court should feel free to adopt the methodology contained in the amendments to the Act which were not approved until months later. Plaintiffs further assert that under that methodology, the government's payments to them for the 1987 crop year were not "due" until February or March, 1988.

The Court has carefully considered the arguments of both sides and concludes that the arguments of the government on this point are more logical. It seems to the Court that giving the words of the P.L. 100–202 their plain, ordinary meaning suggests such a result. The government incurred its obligation to these farmers when the parties signed up for the program in 1987 for the 1987 crop year (subject of course to the government's right to not pay should the producer be found to fail some eligibility requirement). Sometimes producers receive some advance payment long before any final deficiency payments are due.

Furthermore, such a decision is consistent with several "rules" of statutory construction, including that of giving a certain amount of weight to an agency's interpretation of a statute or regulation covering an area of its expertise, and the principle that the right to interest from the government must be expressly found, etc.

## V.

### Equal Access to Justice Act

As more fully set out in the government's brief on this point, the request for fees under EAJA, even if one *prevails* on some significant point, is not to be made until a litigant has had judgment entered in its favor. Accordingly, plaintiffs' request was, at best, premature and need not be addressed in today's order. Should plaintiffs believe themselves entitled to EAJA fees for relief granted by the Administrator, they can reapply for fees, and submit authority in support for that proposition.

## VI.

### Summary

For the reasons more fully set out above, the Court holds that the Administrator's determination that Wesley Huntsman should not be deemed a separate person within the meaning of 7 C.F.R. Part 795, and should accordingly be "combined" with HFI and Tommy Wachtel, is supported by substantial evidence in the record.

The Court further holds that sufficient evidence exists in the administrative record to support the agency's determination that Tommy Wachtel should not be deemed a separate person within the meaning of 7 C.F.R. Part 795, and should accordingly be "combined" with HFI and Wesley Huntsman.

The Court further holds that sufficient evidence exists in the administrative record to support the agency's determination that HFI improperly engaged in a "scheme or device" and should therefore be denied payments. Accordingly, the Administrator's 1994 determinations are essentially affirmed in all substantive respects.

The Court further holds that plaintiffs' claim for interest under the Prompt Payment Act is denied.

Finally, as stated in Part V of this Order, plaintiffs' request for fees under EAJA is premature at this time.

IT IS SO ORDERED.